AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT

June 14, 2024

CENTRAL DISTRICT OF CALIFORNIA
BY: ___IV___ DEPUTY

| | |
|---|---|
| United States of America<br><br>v.<br><br>CODY MICHAEL SUMBER,<br><br>Defendant | Case No. **2:24-mj-03585-DUTY** |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of June 14, 2024, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Jolisia Bennett*
Complainant's signature

Jolisia Bennett, United States Postal Inspector
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: June 15, 2024

*Patricia Donahue*
Judge's signature

City and state: Los Angeles, California

Hon. Patricia Donahue, U.S. Magistrate Judge
Printed name and title

AUSA: Brandon E. Martinez-Jones, x7167

**AFFIDAVIT**

I, Jolisia Bennett, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against Cody Michael Sumber ("SUMBER") for violations of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2. The facts set forth in this affidavit are based upon my personal observations; my training and experience; and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.

## II. BACKGROUND OF AFFIANT

3. I am a United States Postal Inspector with the United States Postal Inspection Service ("USPIS") and have been so employed since August 2021. I am currently assigned to the USPIS Los Angeles Division, Contraband Interdiction and Investigations ("CI2") team. The CI2 team is responsible for investigating drug trafficking violations, including those covered under Title 21 of the United States Code (Controlled Substances) involving the United States Postal Service ("USPS").

1

As such, I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7).

4. I have completed a sixteen-week basic training course in Potomac, Maryland, which included training in the investigation of drug trafficking via the United States Mail. The USPIS is the primary investigative arm of the USPS and is charged under 18 U.S.C. § 3061 with the enforcement of laws governing the use and movement of the United States Mail, including the misuse of and fraudulent schemes involving the mail, crimes relating to mail fraud and narcotics trafficking, and identity theft involving the United States Mail.

5. Through my training, experience, and discussions with fellow United States Postal Inspectors, I am familiar with the various methods used to smuggle and traffic in narcotics and the proceeds from the narcotics sale, including the manufacturing, storage, transportation, and distribution of narcotics, the collection of money that represents the proceeds of narcotics trafficking, and money laundering. I am also familiar with the way narcotics traffickers transport and distribute narcotics in areas they control, including through the use of the United States Mail.

### III. SUMMARY OF PROBABLE CAUSE

6. On June 12, 2024, I obtained federal warrants to search a residence located on Meadowvale Avenue in Los Angeles, California (the "Primary Residence") and an apartment residence located on South Broadway in Los Angeles (the "Stash House") for evidence of violations of narcotics offenses and related crimes.

2

7.  On June 14, 2024, I and other law enforcement agents executed these warrants and searched the Primary Residence and the Stash House.

8.  Inside the Stash House, agents found bags and parcels containing bulk quantities of substances suspected of being methamphetamine, cocaine, and fentanyl; cash-counting machines; agents believed to be used for refining narcotics; a vacuum-sealing machine; packaging materials; and other evidence of drug trafficking.  Agents also found several firearms, including a VR80 model 12-gauge shotgun and an AR-style pistol that appears to lack any serial number; firearm magazines; and ammunition.

9.  Inside the Primary Residence, agents found bags containing substances suspected of being methamphetamine, fentanyl, and marijuana.

10. In a Mirandized statement, SUMBER admitted that he obtained and used the Stash House to package and distribute narcotics.

### IV. STATEMENT OF PROBABLE CAUSE

11. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

   **A.   Law Enforcement Finds Substantial Quantities of Suspected Narcotics, Including Fentanyl, and Guns in SUMBER's Stash House and Primary Residence**

12. On June 12, 2024, the Honorable Alicia G. Rosenberg, U.S. Magistrate Judge, issued warrants in matters 2:24-MJ-03445, 03446, and 03447, authorizing law enforcement to search the Primary Residence, the Stash House, and SUMBER's person,

respectively, for evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances), 843(b) (unlawful use of a communications facility to facilitate the distribution of a controlled substance), and 846 (conspiracy and attempt to distribute controlled substances). Based on law enforcement's investigation, I suspected that SUMBER resides at the Primary Residence and that he used the Stash House to store and package illegal drugs for distribution.

13. I and other agents executed these search warrants on June 14, 2024. When the warrants were executed, SUMBER was present at the Primary Residence along with his significant other and child.

14. Based on my own involvement in this investigation; my conversations with Federal Bureau of Investigation ("FBI") Special Agent ("SA") Brent James, USPIS Inspector Lyndon Versoza, and other law enforcement agents; and my review of photographs, reports, and the evidence collected in this case, I know that the following occurred during the search of the Stash House:

    a. Inside the Stash House, agents found a safe. Law enforcement opened the safe. Inside the safe, agents found plastic bags and packages containing bulk quantities of substances that, based on my training and experience, I believe to be narcotics, including cocaine, fentanyl, and methamphetamine. At least one of the packages was marked with the word "Coke," which I know to be a common term for cocaine

used by drug traffickers.  Agents also found plastic bags and a jar containing a large number of blue pills stamped with "M 30." Based on my training and experience, I know that such pills are often counterfeit oxycodone tablets that in fact contain illegally manufactured fentanyl.  A picture of the open safe and its contents is attached below:



5

b. In a bathroom at the Stash House, agents found a plastic tub filled with a white crystalline substance that, based on my training and experience, I believe to be methamphetamine; a large glass jar containing a similar substance that I also believe to be methamphetamine; and jugs of chemical agents that, based on my training and experience and my conversations with other law enforcement officers who have experience investigating drug-trafficking crimes, I believe to be agents commonly used to refine or purify methamphetamine or other narcotics. A photograph of some of these items is attached below:



c. In a closet in a bedroom of the Stash House, agents found two cardboard boxes containing vacuum-sealed plastic bags. At least several of these bags contained bulk quantities of white crystalline substances that, based on my training and experience investigating drug-trafficking offenses, I believe to be methamphetamine. Near these boxes, agents found a vacuum-sealing machine. Based on my training and experience investigating drug-trafficking offenses, I know that drug traffickers commonly use vacuum-sealing machines to vacuum-seal packages of drugs for easier and safer storage, transportation, and distribution. A photograph of these boxes and the vacuum-sealing machine is attached below:



      d.    Inside the Stash House, agents also found cash-counting machines.  Based on my training and experience investigating drug-trafficking offenses, I know that drug traffickers frequently keep or handle large quantities of cash both to fund their activities and also as proceeds of their illegal business.  They also frequently use cash-counting machines to more efficiently count and bundle such cash.

      e.    Throughout the Stash House, including in the bedroom closet near the two boxes containing suspected methamphetamine referenced above, agents found packaging materials.

      f.    In a case in the same bedroom closet where agents found the vacuum-sealing machine and boxes containing methamphetamine referenced above, agents found a case containing a black VR80 model 12-gauge shotgun and several firearm magazines.  A photograph of this shotgun is attached below:



8

g. On a bed in the same bedroom, agents found a black AR-style pistol that appeared to lack any serial number and a black firearm magazine that appeared to contain at least five rounds of ammunition loaded inside of it. (Firearms lacking serial numbers are commonly called "ghost guns.") A photograph of this firearm is attached below:



h. In the same closet, agents found a second safe. During the search of the Primary Residence (described further below), agents found a set of keys that, during a Mirandized interview, SUMBER identified as the keys to this safe. Agents opened the safe and found two pistols inside of it.

9

    i. Also in the Stash House, agents found a credit card bearing SUMBER's name.

15. A photograph of the drugs and other evidence found during the search of the Stash House is attached below:



16. Based on my own involvement in this investigation; my conversations with USPIS Inspector Wilford Claiborne and other law enforcement agents; and my review of photographs, reports, and the evidence collected in this case, I know that, during the search of the Primary Residence, agents found a bag on a desk in a bedroom inside the Primary Residence. Inside the bag, agents found one bag containing suspected fentanyl, as well as an identification card and bank cards bearing SUMBER's name. On the same desk, agents found other bags containing suspected methamphetamine, fentanyl, and marijuana.

17. Based on my training and experience investigating drug-trafficking offenses, and based on my conversations with other investigators with experience investigating such offenses, I know that drug traffickers commonly possess and carry firearms and ammunition to protect their persons, their stash house, and their drug-trafficking businesses, including to protect any drugs they buy, sell, or otherwise distribute.

18. Because law enforcement suspected that at least some of the suspected drugs found in and seized from the Stash House and Primary Residence contained fentanyl; because fentanyl is toxic even in small doses; and because the Stash House is in close proximity to other residential apartments, agents did not conduct field tests on the suspected drugs to ensure the safety of officers and neighboring residents.

**B.    SUMBER Admits to Using the Stash House to Keep and Distribute Drugs**

19. I conducted a <u>Mirandized</u> interview of SUMBER. SUMBER told me the following:

    a.   SUMBER obtained and used the Stash House to package and distribute narcotics.

    b.   He used a red key fob on a key ring to access the Stash House. Agents found this red key fob during the search of the Primary Residence.

    c.   SUMBER's wife had no involvement in SUMBER's possession or distribution of drugs.

    **C.**    **SUMBER's Criminal History**

20. Based on my review of criminal-history reports for SUMBER, I believe the following:

    a. In April 2012, SUMBER was convicted of simple assault in violation of North Carolina General Statutes § 14-33(a), a misdemeanor.

    b. In August 2013, SUMBER was arrested by the Boca Raton Police Department for burglary of an unoccupied conveyance in violation of Title XLVI, Section 810.02 of the Florida Statutes, among other crimes.

    c. In July 2017, SUMBER was convicted of assault with a deadly weapon in violation of North Carolina General Statutes § 14-33(c)(1), a misdemeanor.

## V. CONCLUSION

21. For all of the reasons described above, there is probable cause to believe that SUMBER has committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  15th day of
June, 2024.

*Patricia Donahue*
_____
HON. PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE